UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

UNITED STATES OF AMERICA           :
                                    :

             - v. -               :                  12 Cr. 302 (ER)

                                    :

PETER GROMACKI,               :

                                    :

                Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

JASON P.W. HALPERIN
ANDREA L. SURRATT
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA        :
                               :

      - v. -               :              12 Cr. 302 (ER)
                               :

PETER GROMACKI,            :
                               :

           Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

### PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum in advance of the sentencing of defendant Peter Gromacki, which is scheduled for November 26, 2013, at 11:30 a.m.  The defendant pled guilty to conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") for his role in a scheme to illegally export from the United States into China high-grade T-700 carbon fiber.  The Government respectfully submits that a sentence within the Guidelines range of 46-57 months is sufficient, but no greater than necessary, to serve the purposes of sentencing in this case.

### FACTUAL BACKGROUND

**1.**    **Offense Conduct**[1]

On July 30, 2013, the defendant, without the benefit of a plea agreement, pled guilty to a three-count indictment charging him with conspiracy to violate IEEPA, violation of IEEPA, and making false statements in connection with his violations of IEEPA.  (PSR ¶¶ 1-4).

---

[1] A more detailed recitation of the offense conduct appears in the Presentence Investigation Report ("PSR") at Paragraphs 10-22.

The offenses of conviction involved the illegal exportation of carbon fiber from the United States, through a transshipment point, to the People's Republic of China ("PRC").

Carbon fiber is a product that consists of thin fibers made of carbon atoms and has a wide variety of industrial uses. For example, it can be used in aerospace engineering and it can be used in gas centrifuges that enrich uranium. Since carbon fiber has both military and non-military uses, it is typically characterized as a "dual use" commodity. Carbon fiber can be produced in varying tensile strengths. T-700 carbon fiber – a particular type of carbon fiber manufactured by a company called Toray – has high strength, but low weight, characteristics that make it particularly suited for the production of gas centrifuges.

During the defendant's conspiracy to violate IEEPA, the defendant agreed with two co-conspirators – CC-1 and CC-2 – to transship commodities illegally from the United States to locations in Europe and then China. (PSR ¶ 18). These shipments included, among others, a shipment of 3,029 kilograms – more than 6,000 pounds – of U.S.-made T-700 carbon fiber that the defendant procured from the U.S.-based manufacturer. The carbon fiber was first transshipped to CC-1 in Europe, before reaching CC-2 in the PRC. (PSR ¶ 20).

The defendant was aware, at the time of the shipment, that CC-2 in the PRC would be receiving the carbon fiber. And, before the defendant undertook this shipment, he was aware that shipping T-700 carbon fiber from the U.S. the PRC was prohibited under U.S. law. Indeed, the defendant took steps to conceal the true nature of the shipment from U.S. authorities. While engaging in his criminal conduct, the defendant made false statements on a Shippers Export Declaration form by lying about the ultimate consignee of the shipment; the ultimate country of destination of the shipment; and about whether an export license was needed for the shipment. (PSR ¶ 22).

## 2. Related Conduct

In addition to the criminal conduct that forms the basis for the offenses of conviction, the Government is aware of other instances in which the defendant intentionally violated U.S. export laws. Until January 2012, when the Department of Commerce revoked his license, the defendant was specifically licensed to export $1,300,000 worth of T-300 carbon fiber to Ameron Ltd., a company in Singapore. In his own sentencing submission, the defendant admits that, after this license was revoked in January 2012, he continued to ship carbon fiber to Singapore. In his submission, the defendant admits he continued these illegal, unlicensed shipments while he appealed his license determination to the Department of Commerce and that he did not know the reason his license had been revoked. (Def. Mem. 11). Notably, he does not claim that he believed that he was permitted to continue making these shipments.

In these post-January 2012 illegal, unlicensed shipments, the defendant took affirmative steps to conceal his actions from the Department of Commerce. For instance, in February 2012, the defendant transshipped two bobbins of carbon fiber through South Korea to Taiwan – a transaction that required a license that the defendant did not *ever* have. In order to effect this shipment, the defendant ensured that the box of carbon fiber did not show the name of the carbon fiber distributor, E&L, on the shipping box in order to hide the true nature of the shipment from customs authorities. (*See* Exhibit B).

Also beginning shortly after he lost his license to ship to Ameron, Ltd. in Singapore, the defendant began seeking ways in which he could continue sending carbon fiber shipments to his Singapore customer – shipments that, since the defendant no longer had a license, were illegal. In early 2012, for instance, the defendant transshipped carbon fiber through South Korea and then onto Singapore. While engaging in this illegal shipment, the defendant

and his co-conspirators became aware that a South Korean export license would be required to ship the carbon fiber from South Korea to Singapore, and a co-conspirator told the defendant that he would obtain that license. (*See* Exhibit E). However, as the defendant knew, a license was also required to ship carbon fiber to Singapore from the United States through *any* transshipment point and neither the defendant nor any of his co-conspirators obtained such a license.

Next, in March 2012, the defendant made an agreement with a co-conspirator in North Carolina ("CC-3") in which CC-3, who owns a company ("Company-1"), would assist the defendant in shipping carbon fiber from the United States to the Singapore customer. The defendant explained to his customer in Singapore that it had been difficult to find a transshipment route for this product: "After attempting to ship via Canada, Taiwan and Korea, I have a contact in North Carolina who owns [Company-1]. . . [CC-3] has agreed to handle the export from USA. I'll supply you with the lot details tomorrow so that you can submit an order to [Company-1] at the same price. I must remain independent of this transaction as I'm now very close to obtaining export license back and do not wish to jeopardize progress made with DOC." (Exhibit C-1). The defendant's customer was concerned with this arrangement, however, since "[Company-1] is not a qualified vendor to purchase materials from . . . [a]nd we need Invoice from [the defendant's company] in order for our account to process the payment." (Exhibit C-2). The defendant assured his customer that "[Company-1] could simply serve as the exporter on record" and that the defendant's company could still "generate the certification and invoice." (Exhibit C-2). Ultimately, the defendant, through CC-3's Company-1, agreed to send approximately 1,800 pounds of carbon fiber to his customer in Singapore. (Exhibit C-3). In short, the defendant utilized Company-1 to serve as a front for his unlicensed shipments of carbon fiber on approximately eight occasions in 2012.

<u>**SENTENCING GUIDELINES ANALYSIS**</u>

Based on the facts in this case, the Government submits that the following Guidelines calculations apply to defendant the defendant's sentencing.

**1.     The Defendant's Base Offense Level, Pursuant to Section 2M5.1(a)(1), is 26**

The parties agree that that the Sentencing Guideline applicable to the defendant's offense conduct is U.S.S.G. § 2M5.1(a).  In its *Pimentel* letter provided to the defendant prior to sentencing, the Government calculated that the defendant's base offense level is 26, pursuant to § 2M5.1(a)(1) because the export of T-700 carbon fiber to China "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded."  The defendant argues that because he believed that the T-700 carbon fiber would be used by his Chinese customer for "an infrastructure project" and not any application that would compromise U.S. national security, any threat to national security in this case is "theoretical," and not "real."  (Defendant's Sentencing Submission ("Def. Mem.") at 5-6).  Accordingly, the defendant believes that § 2M5.1(a)(2) is applicable, and a base offense level of 14 applies.  For the reasons set forth below, the defendant's argument fails in all respects and, accordingly, the Government agrees with the Probation Department (PSR ¶ 34) and respectfully urges the Court to assign the defendant a base offense level of 26, pursuant to U.S.S.G. § 2M5.1(a).

For convictions under IEEPA, Title 50, United States Code, Section 1705, the applicable Guidelines section is 2M5.1.  Section 2M5.1(a), Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism, states:

(a)     Base Offense Level (Apply the greater):

(1)     26, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical

weapons or materials were evaded; or (B) the offense involved a
financial transaction with a country supporting international
terrorism; or
      (2)     14, otherwise.

U.S.S.G. § 2M5.1.  Thus, Section 2M5.1 provides for a base offense level of 14 unless, for

purposes of the defendant's sentencing, "national security controls . . . were evaded," in which

case the base offense level is 26.

<b>a.      National Security Controls Were Clearly Implicated by the<br>Defendant's Conduct</b>

There can really be no serious debate that national security controls were evaded

by the defendant's participation in a conspiracy to ship high-grade T-700 carbon fiber to the PRC

in violation of United States export law.  Indeed, the statutory language and export regulations

underpinning IEEPA and the United States export controls on high-grade carbon fiber make

clear that "national security controls" are implicated by the defendant's criminal conduct.

By virtue of the IEEPA, Title 50, United States Code, Sections 1701-05, the

President was granted authority to deal with unusual and extraordinary threats to the national

security and foreign policy of the United States.  *See* 50 U.S.C. §§ 1701, 1702.  The Export

Administration Act ("EAA"), 50 App. U.S.C. §§ 2401 2420, also regulates the export of goods,

technology, and software from the United States.  Pursuant to the provisions of the EAA, the

Department of Commerce ("DOC") promulgated the Export Administration Regulations, 15

C.F.R. § 730-774 (the "EAR"), which contain additional restrictions on the export of goods

outside of the United States, consistent with the policies and provisions of the EAA.  See 15

C.F.R. § 730.02.  Although the EAA lapsed on August 17, 2001, pursuant to the authority

provided to the President under the IEEPA, the President issued Executive Order 13222.  In that

order, the President declared a national emergency and found "that the unrestricted access of

6

foreign parties to U.S. goods and technology . . . in light of the expiration of the Export

Administration Act of 1979, as amended (50 U.S.C. App. 2401 *et seq.*), constitute an unusual

and extraordinary threat to the national security, foreign policy, and economy of the United

States." Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions

remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly

signed renewals of the national emergency with respect to the EAA's expiration, the most recent

being on August 8, 2013. *See* 78 Fed. Reg. 49107 (Aug. 12, 2013). Under IEEPA, it is a crime

to willfully violate any regulation promulgated thereunder, including the EAR. *See* 50 U.S.C. §

1705.

      Generally speaking, the EAR applies to goods, technology, and software that are

"dual use" in nature, meaning that they have military and non-military uses. Among other

things, the EAR prohibits the export of certain goods and commodities to specific countries,

absent permission from the DOC issued in the form of an export license. Specifically, the DOC

has devised the "Commerce Control List" ("CCL"), *see* 15 C.F.R. § 774, which consists of

general categories of goods that are controlled for export and are so designated by an "Export

Control Classification Number" ("ECCN"). The DOC also has devised the "Commerce Country

Chart," *see* 15 C.F.R. § 738. In the event that a commodity or good is on the CCL, then an

exporter must consult the Commerce Country Chart ("CCC") to determine whether an export

license from the DOC is required to export the CCL item to a given country. Certain types of

carbon fiber fall on the CCL, and cannot be exported to the PRC, among other countries, without

the prior permission of DOC issued in the form of an export license.

      The Department of Commerce has issued a determination that the type of carbon

fiber (T-700) that the defendant arranged to be exported from the United States to the PRC is on

the CCL and was (at the time of the defendant's export) classified under ECCN 1C010. This type of carbon fiber was classified under ECCN 1C010 for national security, nuclear non-proliferation, and anti-terrorism reasons because it could significantly contribute to the military potential of another country and could be of significance for nuclear proliferation. Accordingly, pursuant to the EAR, an individual or entity in the United States who seeks to export T-700 carbon fiber to the PRC must obtain a license to do so – something the defendant indisputably did not do.

**b.     Caselaw Suggests that Level 26 Should Apply**

As is evident from the statutory scheme described above, the export of T-700 carbon fiber from the United States to the PRC is controlled for national security reasons. Standing alone, this is enough for the Court to determine that a base offense level of 26, pursuant to Section 2M5.1(a)(1) is appropriate. But, this plain-language reading of the statutory scheme is bolstered by the decisions of courts that have had an opportunity to consider the issue, and the resulting caselaw leaves no doubt that a base offense level of 26 is appropriate in this case.

In *United States* v. *Hanna*, 661 F.3d 271 (6th Cir. 2011), for instance, the Sixth Circuit concluded that Section 2M5.1(a)(1)'s enhancement applied in a case involving the illegal shipment of goods to Iraq, a country under embargo because the President, by executive order, determined that Iraq "poses a threat to national security." *Id.* at 293. Indeed, the Sixth Circuit noted, "[e]very court to address the issue has held that the evasion of [IEEPA embargo] sanctions are national security controls" for purposes of the Sentencing Guidelines, and thus that the enhanced Base Offense Level ("BOL") of 26 should apply under U.S.S.G. § 2M5.1(a)(1). *Id.* The court explained, "[t]his is because in Executive Orders like the Iraq embargo, the President determines that a particular country poses a 'threat to the national security' of the country, and

therefore orders an embargo." *Id.* The *Hanna* court emphasized that the sentencing enhancement applies to "any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods actually are intended for some innocent use." *Id.*

Similarly, in *United States* v. *McKeeve*, 131 F.3d 1 (1st Cir. 1997), the First Circuit rejected a defendant's argument that U.S.S.G. § 2M5.1(a)(1) "cannot apply in a sale-of-goods case unless the government presents evidence that the particular goods, when or if sold, constitute an actual threat to national security." *Id.* at 14. The court instead found Section 2M5.1(a)(1)'s enhanced base offense level applicable and held, in a case dealing with an embargo against Libya, that "[t]he embargo is an exercise of executive power authorized by IEEPA 'to deal with any unusual and extraordinary threat . . . to the national security." *Id.*; *see also United States* v. *Elashyi*, 554 F.3d 480, 508 (5th Cir. 2008). Because "the embargo is intended as a national security control," as the First Circuit stated succinctly in *McKeeve*, "that ends the matter." 131 F.3d at 14.

Southern District of New York Judge Kevin T. Duffy came to the same conclusion in a case involving the shipment of goods to North Korea. *United States* v. *Min*, Dkt. No. 99 CR. 875 (KTD), 2000 WL 1576890 *2 (S.D.N.Y. Oct. 23, 2000) (determining that the applicable base offense level would derive from Section 2M5.1(a)(1)). In *Min*, Judge Duffy noted that the critical analysis, with respect to interpreting "national security," is "whether the embargo or prohibition is based on national security concerns." *Id.* at *2 (citing *McKeeve*, 131 F.3d at 14).

The defendant in the instant case contends that his case is unlike cases such as *Hanna* or *McKeeve* in which defendants exported goods Iraq, Iran, or Libya, which are state sponsors of terrorism. (Def. Mem. at 6). The defendant argues that, by contrast, the PRC is not

a terrorist nation and, therefore, his export of carbon fiber to the PRC should not be subject to the same sentencing enhancements as the export of goods to nations that are. (Def. Mem. at 5). This argument misapprehends the law and must be rejected. While it is true that Presidents have, pursuant to their authority under IEEPA, declared a national emergency with respect to specific countries, such as Iran, *see* Exec. Order No. 12,957, 60 Fed. Reg. 14, 615, Presidents have also declared a national emergency because exports of certain goods to certain foreign countries "constitute an unusual and extraordinary threat to the national security" of the United States. As explained above, given this threat to national security, the Department of Commerce ("DOC") has promulgated the Commerce Control List ("CCL") and Country Control Chart ("CCC") which, together, dictate licensing requirements for export of certain goods. There is no dispute in this case that T-700 carbon fiber is one of the goods that, because of this "unusual and extraordinary threat to the national security," is export-controlled. Moreover, T-700 carbon fiber specifically is controlled for national security, among other reasons. Thus, under the terms of the statutory scheme and regulations, just as the export of goods to Iraq or Iran in violation of IEEPA constitutes a threat to national security, so does the export of T-700 carbon fiber to the PRC.

In this case, therefore, there should be no question that by exporting high-grade carbon fiber to the PRC in violation of IEEPA, the defendant evaded the "national security controls" that are in place by virtue of IEEPA and a that base offense level of 26 is appropriate.

### c. The Defendant's Other Claims about the Base Offense Level Lack Merit

The defendant also argues that because he had no "reason to believe that the carbon fiber" shipped to the PRC "would be used for "any purpose other than manufacturing consumer goods for and for a construction project," any harm to U.S. national security was hypothetical. (Def. Mem. at 5). Put another way, because the defendant contends that because

he believes he knew the end-use of the carbon fiber, national security was not actually harmed, and the sentencing enhancement for evasion of national security controls cannot be imposed. This argument is easily rejected. First, the defendant does not, and cannot, actually know for what purpose the T-700 carbon fiber was ultimately used. Even if he was given assurances by his Chinese customer that the carbon fiber would be used for a particular application, the defendant has no way to verify these claims. Second, the law – and the Sentencing Guidelines – leave no room for individuals to make their own determinations of what exports will harm the national security of the United States. The President, and the DOC, have decided that the export of T-700 carbon fiber to the PRC inflicts such a harm, and it is not the defendant's prerogative to disagree. Accordingly, it is for good reason that "whether or not the goods actually are intended for some innocent use," is of no moment to this analysis. *Hanna*, 661 F.3d at 293.

Finally, the defendant contends that because the PRC is a large consumer of, and produces its own, carbon fiber, this somehow shows that the regulations promulgated under IEEPA have not "kept up with the reality of the marketplace." (Def. Mem. at 3). Obviously, the defendant's opinions about the DOC's regulations are of no significance here; whether the defendant believes that DOC's restrictions on the export of T-700 carbon fiber to the PRC are outdated is simply irrelevant to the analysis of whether Section 2M5.1(a)(1)'s sentencing enhancement applies.

Moreover, the defendant's own statements, made during the course of the conspiracy, belie the defendant's suggestion that, even in the PRC, carbon fiber is an easily-obtainable commodity. In an email that the defendant sent to his Chinese customer in December 2006, he acknowledged that certain types of carbon fiber are difficult to obtain: "You are correct, there is no 3K or 6K to be had anywhere and the problem is not going to be resolved until 2008

when extra capacity is brought on." (Exhibit A). Certainly, if carbon fiber was easy to obtain in the PRC, there would have been no reason for the defendant's Chinese customer to deal with the expense and difficulties associated with illegally obtaining carbon fiber from the United States.

For all these reasons, since national security controls were clearly implicated by the defendant's conduct, the Government agrees with the Probation Office that the base offense level should be 26.

## 2.     Obstruction of Justice

The PSR adds two points to the defendant's base offense level pursuant to U.S.S.G § 3C1.1 for obstruction of justice based on the defendant's lies on the Shipper's Export Declaration Form that served as the basis for the false statement charges in Count Three of the indictment. The Government disagrees with Probation and respectfully submits that the § 3C1.1 enhancement does not apply in this case.

U.S.S.C § 3C1.1 imposes a two-level enhancement to a defendant's base offense level if:

> [T]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

Application Note 1 to 3C1.1 further elaborates:

> This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant.

> Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered

by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.

U.S.S.G. § 3C1.1 App. N. 1. The obstruction of justice enhancement applies only where a defendant "consciously act[s] with the purpose of obstruction of justice." *United States* v. *Peterson*, 385 F.3d 127, 139 (2d Cir. 2004). "[I]t is not enough that the defendant intended to obstruct the course of justice in some judicial or administrative proceeding. Rather, he must intend to obstruct justice 'with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.'" *United States* v. *Butters*, 513 F. App'x 103, 105 (2d Cir. 2013) (quoting 3C1.1(1)).

The enhancement, therefore, is concerned with conduct intended to impede part of the investigation or prosecution. Here, the defendant's false statements were made in order to effectuate his illegal transactions and further the conspiracy – not to obstruct law enforcement from bringing him to justice. Indeed, at the time he made the false statements, the defendant did not yet realize that he would eventually end up as a defendant in this criminal action. Moreover, if Section 3C1.1 were found to apply in this case, it would be applicable in *every* case in which a defendant is found to be guilty of making false statements in violation of Title 18, United States Code, Section 1001 – a result not intended by Section 3C1.1.

3.      **Acceptance of Responsibility**

Since the defendant timely accepted responsibility, three points are subtracted pursuant to U.S.S.G. §§ 3E1.1(a) and (b). Accordingly, the defendant's adjusted offense level is 23. Since the defendant is in Criminal History Category I, his Guidelines range is 46 to 57 months' imprisonment.

**4.      Criminal History**

The defendant has no known criminal history, and thus is in Criminal History Category ("CHC") I.

**5.      Appropriate Guidelines Range**

Based on the calculations above, with total offense level 23 and CHC I, the defendant's Guidelines range is 46 to 57 months' imprisonment.

<u>**THE SECTION 3553(a) FACTORS CALL FOR A GUIDELINES SENTENCE**</u>

The defendant stands before the Court after being convicted of conspiring to violate IEEPA, violating IEEPA, and making false statements, by shipping, among other things, more than 6,000 pounds of high-grade carbon fiber to the PRC.  As the Court examines the factors set forth in Title 18, United States Code, Section 3553(a) to determine the appropriate sentence for the defendant, the Government respectfully submits that several Section 3553(a) factors counsel strongly in favor of a sentence within the Guidelines range of 46 to 57 months' imprisonment.  Specifically, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to provide general deterrence, and the need to protect the public from further crimes by the defendant all militate toward the conclusion that a Guidelines range sentence would be reasonable and appropriate in this case.

**1.      Applicable Law**

Although no longer mandatory, the Guidelines still provide strong guidance to the Court.  *See United States* v. *Booker*, 543 U.S. 220 (2005); *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, as the Supreme Court explained, "a district court should begin all

sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita* v. *United States*, 551 U.S. 338, 348 (2007); *see also Gall*, 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

After making the initial Guidelines calculation, a sentencing judge must then consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in Section 3553(a)(2). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining that sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

**2.     Discussion**

In this case, a sentence within the Guidelines range is supported by the Section 3553(a) factors for a number of reasons.

**a.     The Nature and Circumstances of the Offense**

Simply put, the nature of the offense in this case was highly serious. With full knowledge that his actions would be in violation of United States export law, the defendant arranged to have more than 6,000 pounds of high-grade U.S.-made T-700 carbon fiber shipped through Europe to the PRC. Though the defendant claims he believed that CC-2, the Chinese end-user of this product, was going to use it in a construction project, in reality, the defendant had no way of knowing the true end use for this substantial shipment of carbon fiber. As described above, though carbon fiber has a variety of civilian and consumer uses, it can also be used for nefarious purposes such as the construction of centrifuges for use in uranium enrichment. High-grade carbon fiber, such as T-700, is particularly well-suited for this latter, military application. The defendant's confidence that his Chinese customer would be using the carbon fiber for an "infrastructure project" is particularly baffling considering that the defendant was introduced to CC-2 by email for the sole purpose of engaging in the charged conspiracy. (*See* Exhibit 1). That the defendant thinks he knows what CC-2 was going to do with 6,000 pounds of high-grade carbon fiber does not at all mitigate the seriousness of this offense.

Moreover, there is no dispute that during the defendant's commission of the charged offense, he knew that he would be violating United States export law by sending carbon fiber to the PRC. He therefore took steps, such as lying on the Shipper's Export Declaration Form, to conceal the true nature of his shipment. Accordingly, not only did the defendant endanger the national security interests of the United States by engaging in the instant offense

16

conduct, he attempted to keep his conduct from being discovered by American authorities who are tasked with enforcing export regulations.

### b. The History and Characteristics of the Defendant

The history and characteristics of the defendant, as well as the need to promote respect for the law in this defendant, also strongly counsel toward the imposition of a within-Guidelines sentence.

This is a defendant who has "been in the carbon fiber industry . . . for 25 years," (Def. Mem. at 4), and was well aware of when export licenses were needed for overseas shipments. As the PSR notes, the defendant knew that a license was required for the shipments of carbon fiber to the PRC, but the defendant chose not to seek one because "of the length of time it would take and the fear that he would then lose a potential customer for his business." (PSR p. 26). Accordingly, rather than attempt to obtain a license from the Department of Commerce and risk losing a paying customer, the defendant put his own pecuniary interests ahead of the interests of the United States and agreed with CC-1 and CC-2 to engage in the transaction illegally. As United States District Judge Vincent L. Briccetti explained at a recent sentencing of an IEEPA defendant who had exported high-grade carbon fiber to Iran:

> And as far as I understand, it was a transaction in which the defendant was hoping to make some kind of a profit. Whether he did or not really doesn't matter. And whether he was trying to help a friend or not to me really doesn't matter because he was fully engaged in this and he fancied himself an international businessman. And [do] what international businessmen do? They try to make money. Nothing wrong with that. The problem is when you try to make money by knowingly and deliberately evading national security control of the United States, well, if you get caught doing that it's a really bad thing and you get prosecuted and you go to jail.

(Sentencing Transcript, *United States* v. *Hashemi*, 12 Cr. 804 (VB) ("Hashemi Tr."), Nov. 15, 2013, at 47).

Now, standing before the Court for sentencing, the defendant argues that he would never "knowingly put our national security at risk." (Def. Mem. at 7). The Government does not contend that the defendant *intended* to harm the national security of the United States when he directed 6,000 pounds of T-700 carbon fiber to be shipped to the PRC. But, it is abundantly clear that the defendant was reckless with the national security of this country in pursuit of his own financial gain. Judge Briccetti recently rejected an argument in which the defendant argued that because he believed that exported carbon fiber was being shipped to Iran for an innocuous purpose, he should receive leniency at sentencing:

> There's some evidence from I guess you call him CC-1, co-conspirator 1, that [the carbon fiber] was going to be used for innocuous purposes. But the bottom line is we really don't know. All we know is that it could be used for bad purposes and more importantly we know that it is a material which is banned and you're not allowed to export it from the United States to Iran. And the reason you're not allowed to do it is because it's against the national security interests of the United States.

(Hashemi Tr. at 48). Similarly, in the instant case, the defendant's insistence that he knew the carbon fiber would be used for innocuous purposes is irrelevant since he cannot be certain of the carbon fiber's ultimate end-use. And beyond that, as Judge Briccetti rightly noted, what we do know is that the defendant was prohibited from sending this carbon fiber to the PRC for national security reasons, and this is the very serious offense for which he is being punished.

Furthermore, the defendant's conduct that he engaged in *after* he committed the conduct charged in the Indictment is particularly egregious and counsels strongly for a within-Guidelines sentence. As described above, in January 2012, the Department of Commerce revoked the defendant's license, which had previously allowed the defendant to ship a specific

amount of carbon fiber to Singapore.  Knowing full well that subsequent shipments of carbon fiber to Singapore would be illegal, the defendant nevertheless made multiple shipments of carbon fiber to his customer in Singapore.  In order to effect these illegal shipments, the defendant, knowing that he could not use his own name or company because he was already on the DOC's radar, enlisted CC-3 to help him violate export controls.  In addition, the defendant sent two bobbins of carbon fiber to a customer in Taiwan – a transaction for which the defendant *never* had a license.  These shipments took place while the defendant was undergoing the appeals process with the DOC in an attempt to reinstate his license.  These shipments – and the defendant's dishonest dealings with the DOC – demonstrate the defendant's willingness to completely disregard the law and U.S. export regulations.

The defendant also claims that his incarceration would have a "devastating effect on this family" and argues for a below-Guidelines sentence on that basis.  (Def. Mem. at 10).  This provides no basis for a below-Guidelines sentence in this case.  While unfortunate for the family members, it is often the case that a defendant's criminal conduct (and subsequent incarceration) will have a negative effect on the lives of his family members.  If that is the case here, the defendant has nobody to blame but himself for his predicament.

Thus, the defendant's history and characteristics, and particularly his continued violation of IEEPA as recently as 2012, even after the DOC revoked his license, argue compellingly for a Guidelines range sentence.

       c.      **Deterrence and the Need to Provide Just Punishment for the Offense**

Two other highly significant factors under Section 3553(a) in a case involving violations of the United States export regulations are the need for the sentence "to provide just

punishment for the offense," and to create general deterrence. 18 U.S.C. §§ 3553(a)(2)(A) and (a)(2)(B).

These factors also strongly suggest a Guidelines-range sentence. As noted above, since 2001, Presidents of both political parties have signed executive orders making it the official foreign policy of the United States that "that the unrestricted access of foreign parties to U.S. goods and technology . . . in light of the expiration of the Export Administration Act of 1979, as amended (50 U.S.C. App. 2401 et seq.), constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Thus, by definition, the defendant's conduct violated the national security of the United States. By conspiring to evade and defeat the United States export regulations prohibiting the shipment of high-grade carbon fiber to the PRC, the defendant and his co-conspirators sought to undermine the foreign policy of the United States. Thus, his crime was very serious and the need for general deterrence to help prevent this type of conduct is extremely high.

Moreover, in this case, the defendant's conduct was particularly harmful since he shipped more than 6,000 pounds of high-grade carbon fiber to the PRC. Though the defendant claims that he knew of the end-use for this product, he has no way of knowing for sure whether the carbon fiber ended up in a tennis racket or a centrifuge. Thus, this factor cuts very strongly in favor of a Guidelines range sentence for the defendant both "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and in order "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. §§ 3553(a)(2)(A) and (B).

Finally, the defendant is a repeat offender. He not only engaged in the charged conduct by shipping carbon fiber to the PRC, but after his license to ship to Singapore was

revoked, he continued to evade export controls. That the defendant was entirely undeterred by the loss of his license, and continued to commit violations of export regulations for nearly a year after his license was revoked, renders the defendant's argument that he does not need to be deterred with a lengthy sentence of incarceration entirely unconvincing.

For all these reasons, based on the great need for the sentence to reflect the seriousness of the offense against United States foreign policy, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to future conduct, a Guidelines range sentence in this case is highly appropriate.

3.     **The Need to Avoid Unwarranted Sentencing Disparities**

Finally, imposition of a sentence within the advisory Guidelines range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

a.     **Applicable Law**

In creating the Guidelines, "Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *Rita*, 551 U.S. at 349 (internal quotation omitted). Even after *Booker*, "uniformity remains an important goal of sentencing." *Kimbrough*, 552 U.S. at 107. The Guidelines "help to avoid excessive sentencing disparities," *id.* (internal quotation omitted), because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall*, 552 U.S. at 54, and because most defendants are sentenced within the Guidelines Range. As the Supreme Court stated in *Gall*, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49. A sister court in the Southern District of New York observed

that a "sentencing judge's decision to place special weight on the recommended guidelines range will often be appropriate, because the Sentencing Guidelines reflect the considered judgment of the Sentencing Commission, are the only integration of multiple [3553(a)] factors, and, with important exceptions ... were based upon the actual sentences of many judges." *Arakelian* v. *United States*, Nos. 08 Cv. 3224 (RPP), 04 Cr. 447 (RPP), 2009 WL 211486 (S.D.N.Y. Jan. 28, 2009).

Thus, the Second Circuit has instructed district judges to consider the Guidelines "faithfully" in sentencing. *United States* v. *Crosby*, 397 F.3d 103, 114 (2d Cir. 2005). As the Supreme Court noted, "if judges are obligated to do no more than consult the Guidelines before deciding upon the sentence that is, in their independent judgment, sufficient to serve the other § 3553(a) factors, federal sentencing will not move ... in Congress' preferred direction… On the contrary, sentencing disparities will gradually increase." *Gall*, 552 U.S. at 63-64.

**b.    Cases Cited by the Defendant are Distinguishable From the Instant Case**

In his brief, the defendant argues that a within-Guidelines sentence in his case would create a sentencing disparity with other IEEPA cases. In particular, the defendant contends that it would be "unfair" if he received a sentence of incarceration when he was able to locate cases in which he says that other IEEPA defendants who sent goods to nations like Iran received minimal or no jail time. (Def. Mem. at 8-10).

As a preliminary matter, the exercise of providing other supposedly comparable cases to the sentencing Judge is not particularly helpful since no two cases really involve very similar fact patterns with very similar defendants and with Section 3553(a) factors that stack up in precisely the same way. For every case the defendant cites where a defendant received a sentence lower than the 46 to 57 months' range in this case, the Government will be able to cite a

different case in which a defendant received a higher sentence. That is why there is really no logical, thorough approach to applying this factor – unless a party can really show a sentencing judge that the fact pattern, the Guidelines range, and the analysis of the other Section 3553(a) factors makes a defendant "similarly situated" to the defendant at bar. Thus, the defendant's incomplete survey is meaningless without a careful comparison of the offense conduct, the actual Guidelines ranges applicable in those cases, and all facts relevant to the Section 3553(a) factors contained in the PSR and presented to the various sentencing courts to the facts of this case. Because the defendant makes no such comparison, his argument should be ignored. The limited case summaries provided by the defendant do not provide enough details for the Court to determine whether the defendants in these cases are "similarly situated" at all. In similar circumstances, courts have observed that comparing a defendant's sentence to those imposed in other specific cases is a weak argument. *See*, *e.g.*, *United States* v. *Saez*, 444 F.3d 15, 19 (1st Cir. 2006) (noting that such tenuous comparisons "open the door to endless rummaging by lawyers through sentences in other cases, each side finding random examples to support a higher or lower sentence, as their clients' interest dictate."). In the same vein, as recently as last week, Judge Briccetti rejected the argument that different cases could be fairly compared in this context: "You know, it's really impossible to compare these cases. I don't know what the operative facts were in those cases. I don't know anything about the defendants in those cases." *United States* v. *Hashemi*, 12 Cr. 804 (VB) (S.D.N.Y. Nov. 15, 2013) (Hashemi Tr. at 50).

Nevertheless, the Government attaches a chart showing a variety of IEEPA cases and where the sentences imposed ranged from 30 months' imprisonment to 56 months' imprisonment. (*See* Exhibit D). The chart includes two recent Southern District of New York

sentences of 46 months – both within the respective defendants' Guidelines range – in IEEPA cases, one involving the export of carbon fiber to Iran.

Accordingly, the defendant's argument that a sentence within the Guidelines range would create an unwarranted disparity among defendants with similar records who have been found guilty of similar conduct, see 18 U.S.C. § 3553(a)(6), is unpersuasive. If anything, Congress implemented the Sentencing Guidelines, and in *Booker*, the Supreme Court upheld at the continuing need for the advisory Guidelines to remain intact, in order to ensure that there were, in fact, guidelines for judges when sentencing defendants across the country with similar records who had been convicted of similar conduct. Thus, sentencing a defendant to a Guidelines-range sentence is the best way for courts to prevent widespread sentencing disparities. Accordingly, the Government respectfully submits that a within-Guidelines sentence is sufficient, but not greater than necessary, to serve the ends of sentencing.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to a sentence within the applicable Sentencing Guidelines range of 46 to 57 months' imprisonment. Such a sentence will not only reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant, but it will send an unmistakable message of deterrence to people anywhere in the world who seek to jeopardize the national security interests of the United States.

Dated: New York, New York
      November 19, 2013

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Jason P.W. Halperin / Andrea L. Surratt
Assistant United States Attorneys
(914) 993-1933 / (212) 637-2493

**AFFIRMATION OF SERVICE**

Jason P.W. Halperin, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.

That on November 19, 2013, I caused one copy of the within Government's Sentencing Memorandum to be filed on ECF and thereby to be delivered by electronic mail to:

Andrew A. Rubin, Esq.          *Counsel for Defendant Gromacki*

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

_____
Jason P.W. Halperin
Assistant United States Attorney
(914) 993-1933

Dated:          White Plains, New York
                November 19, 2013